Maybe on the third case, we'll probably take a brief recess after the end of this argument. Please approach. Please the court. I'm Curtis Kennedy. I'm from Denver. And along with me is Robert E. Goodman, Jr., who could not make it today because he has some personal family issues that he's needing to take care of. I wish my friends opposing counsel well all year we've had to deal with some personal issues. You have made an appearance, a formal appearance in this case. I have, Your Honor. As an attorney. Yes. And this is a complicated ERISA case. And I understand how dreary they can be because Chief Justice Rehnquist said at an ABA convention years ago that ERISA cases seem to be dreary. I'm going to try to simplify this for you so that it doesn't seem so. And I provided Plaintiff's Exhibit 1 to opposing counsel, and I asked the deputy clerk to provide that to you as well. And I've asked that you accept it because it's going to guide you immensely and assist you with understanding the two primary claims in this case. And what it really helps out, this is a plan amendment. This is the actual plan amendment. It's referenced in the complaint. It's talked about extensively in the two appellate briefs, all three appellate briefs. And it really brings to light the distinction that ERISA makes between a settler function and a fiduciary function. And, of course, there's a triology of cases by the Supreme Court, the aerospace cases, Hughes Aircraft, Lockheed, Curtis Wright, in which the Supreme Court said throughout 91 through 1995 that a settler function is such as when you make a plan amendment. So when this plan amendment was created, it's a settler function, and it's immune from all the fiduciary obligations. And we try to make that clear in our complaint and in our briefing that what we're complaining about is not the settler function here in the sense that the plan amendment itself is a settler function, but we're complaining about what's highlighted on the last page when the responsibility was delegated to the plan fiduciaries, specifically acting as plan fiduciaries, to determine the terms of the annuity contract or contracts. And that's what we complain about in count number two, that when the fiduciaries had this responsibility, they let down the people and they did not act in the best interest of the transferee class, the class of 41,000 people who were lifted out of the pension plan and transferred to a state-governed insurance annuity. Now, while I'm on that same vein and I talk about the settler function— Let me make sure I understand what you're saying. The settler function included this effective December 7, 2012, Section 8.3 is amended, and thereafter, there will be annuities. What was given to the fiduciaries to decide is how many. A good part of your argument complains about whether annuities should have been permitted at all. But isn't that the settler function even under this—clearly under this oral argument document you've given us? That is a settler function, and I want to point out that although a settler generally is free to make these changes, there is a restraint on a settler, and that is Section 510. 510 doesn't just apply to fiduciaries. It applies to everyone, including settlers. And when this amendment was created and they specifically lifted out 41,000 people and kept the plan ongoing, that on its face was discrimination. And that's the heart of the claim that we assert in Count 3 is that even though they're acting as a settler, they violated Section 510, and that picks up where the court has left off in two prior cases where the court has commented that when you make a change that has uniform application, it's not necessarily discrimination. For instance, in the McGann case where the company decided to cut back coverage for a medical condition known as AIDS, that applied uniformly to everybody. Even though it only immediately affected the people who may have symptoms or may have already acquired AIDS, it would apply to everyone. And the court did indicate in that opinion, and it was taking notice of the First Circuit's observation in Arison, in which the First Circuit noted that there can be such a thing as a discriminatory plan amendment which sets apart one group of plan participants and favors them and treats an identical group of plan participants in a different manner. That was 30 years ago. The courts have not really had to grapple with a plan amendment of this nature until now. This is unprecedented where a corporation decides to keep a plan ongoing but plucks out a group and puts them into an insurance annuity. And one might ask, well, what's the problem with that? Because they're still getting the same dollar amount, and that's pretty much the way Chief Judge Fitzwater saw the issue. They're getting the same dollar amount. Isn't it also a problem, though, that maybe except for this discrimination claim you have, that I think undoubtedly under the law they could have terminated the whole plan, put everyone into this annuity? So normally the greater includes the lesser. Here they just transferred some of the people. So I know there might be a difference there for your discrimination claim, but on your fiduciary duty claim, on your disclosure claim, how can we make a distinction with the fact that they could have ended the whole plan and done this? Well, they certainly could have ended the whole plan, and that's usually the way companies operate. They end the whole plan. That way it uniformly affects everybody the same, and they go into the annuitization process. This is very different, and the reason this is of concern to the retirees is it's not what they bargained for. They understood that that possibility of a termination might happen someday, but it's going to happen to everybody at once, that they're not going to just discriminate against us. And the problem with these annuit. . . But the risk to them is the same. It's sort of like I tell my kids, I don't want to hear about what the kid down the street is dealing with. And you're worried about this risk of that they no longer have the federal guarantee. I mean, that's true if they terminated the plan and put everyone into the annuity. Well, that would have been true, and that's the way they should have operated, because there's a. . . And your clients would be just as bad off as you think they are now. Perhaps not, because at that time there would probably be an effort to do some of the things that we've asked them, why didn't you do? And one of the things that could have been done here on behalf of the transferee group of retirees is to make sure that there continues to be the same kind of disclosures and to make sure that this insurance annuity, if it's in a segregated plan, if there's a possibility, is placed in a lockbox within the plan itself and designated as being only responsible for payment of these pension benefits. Now, that was a possibility, but it didn't get considered because there was no consultation. There was no effort to make sure that the desires of the retirees were met. And I've got to point out that once you take them out of the pension plan, and although they've left 40 or 55,000 still in the plan, those people are all protected and have the bells and whistles. It's not just so much that you get a check. And, you know, people didn't work for a check payable by the company because that was the reason we enacted ERISA, and Congress's intent was overall to protect the interests of the retirees and their benefits. They didn't work to get an insurance annuity because it's not protected from creditors, it's not protected from bankruptcy, and I've got scores of retirees in my class that now have this immediate issue that they wouldn't have had had they stayed in the plan. And interestingly, if you look at the plan— Let me make sure I understand what you're saying the immediate issue is. There is no question, as you seem to acknowledge from Judge Costa's question, that an annuity could have been created regardless of losing the benefit of the federal government protection. That's written into ERISA that this can be done. So absent discrimination, your arguments, and maybe we're making too much of absent discrimination, maybe that's what you're talking about, of the different effects on those in the transferee class and the non-transferee class, and maybe that's what you're discussing, and I'm not trying to cut that off. But insofar as the legality of this, everything they did is perfectly legal, it seems to me, at least on what we've talked about so far, unless it discriminates against the non-transferees. Well, I've got to pull back a little bit and say it's never been done before. There aren't really regs that address it one way or another because the regs only talk about taking people out of the plan at the beginning of their retirement and annuitizing them or doing it when you terminate the plan. This is the first of its kind in the nation. And the one thing that really ‑‑ But the difference in it is that some people are left behind, but as to these 40,000 or whatever it is, the plan has terminated, correct? No, the plan has not terminated. As to these 40,000. No, it hasn't, Your Honor, and let me explain why it hasn't. And that's one thing that my friends and my opposing counsel don't want to talk about. They're still in the plan if you have a surviving spouse. If you have a qualified surviving spouse that happens to be living with you, not in a nursing home at the time of your death, they're still entitled to a lump sum payment, which is known as a pension or death benefit. So if anything, they're a little bit better off because of that, in your view, of how this affects them than if the whole plan had been completely terminated. They're not really better off because if they'd stayed in the plan, they would be protected from the creditors. No, but they're better off than if the whole plan had been shut down because they still have this little survival benefit. Everybody would agree with that concept. If the whole plan is shut down, nobody's going to be good, and we don't want that. But I want to reserve my time, but I wanted to point out that the transferring class has also tried to bring to the court's attention that when this transaction occurred, Verizon used a lot of the pension plan monies to pay expenses that belonged to the settler. And that is clearly discussed in the Department of Labor regs, and it's part of the plan document. Section 8.5 says these monies can only be used for the expenses of carrying out the plan, operating the plan, and these weren't expenses to operate the plan. These were expenses paid to Prudential to operate the annuity into the future. And so we think that those should have been paid out of operating revenues. The issue with respect to disclosure was discussed in the Kohler case by the Fifth Circuit years ago. Looking at the regulation, it seems to require greater clarity than to just tell people that we reserve the right to make changes. This was a circumstance that would result in offsetting your entire benefit and removing you from the ERISA grid, and it wasn't disclosed. And it's not that they needed to wait until an amendment occurred to do it. The company's taken a position that we've always had the right. If we always had the right to terminate the plan, we always had the right to pick and choose and selectively remove people. Well, that was never disclosed, and so the people were blindsided when they did have this brought to their attention, and they had no choice, no say in the matter. And if they had just slowed down and consulted, and we tried our best to slow them down and asked for an injunction, and they had some time to think about it and put in some of these other protections, including notice, annual disclosures, people want to know exactly where's the money, how much is left, what's happening. It's what they were used to for over 30 years, and it worked. If I may, unless the Court has some more questions, I want to preserve what little time I have left. Well, you have five minutes to preserve already. Is that right, Margaret? Yes, you can use this and not affect your remaining time. Well, thank you then. That's all right. I told them that. Thus far, does the Court have any questions? I hope I haven't made this dreary for you so far. What about the standing issue on the non-transferees? I think the distinguishing factor. Congress, of course, has given a statutory right to participants, beneficiaries, co-fiduciaries, and the Secretary of Labor, and it seems that they gave everybody equal standing. And a couple of circuits have come up with this concept that, well, you really don't have any harm and you can't complain if there's a surplus in the pension plan. And that's the Harley case out of the Eighth Circuit and the recent Fourth Circuit David case. And, you know, you've got to wonder, why would people be complaining when there's a surplus anyway? I see that point, but here there wasn't a surplus, and they drove it down to a remarkably low level of 66% funding, and we think they had a right to complain about that issue. But more importantly, I haven't seen a court case, and I know that we all do our homework thoroughly, where someone has been told that you don't have the right to enforce the terms of the plan unless you've been hurt. And that was Section 8.5 that says you only use this money to pay expenses of the plan, not operating revenue charges. Thank you. May it please the Court. Jeffrey Huvel, on behalf of the Verizon defendants with me, is Christian Pistilli. In this case, Judge Fitzwater issued three separate opinions explaining why each of the plaintiff's four claims is legally deficient. His reasoning in those three opinions is entirely sound, and we ask the Court to affirm his ruling. Several important ERISA concepts form the framework for the judge's reasoning. One of those concepts, and a fundamental point about ERISA, is that the pension system that ERISA regulates is voluntary. An employer may establish a pension plan or not. The employer may amend the plan or not. The employer may terminate the plan or not. This case involves a plan amendment. The amendment authorized the purchase of annuities from an insurance company to provide pension benefits for a significant number of employees. Let me ask you, how much of the decision was made by the settlers and how much by the fiduciaries to divide into these two groups of settlers, of transferees and non-transferees, and who was in each category? Who made that decision? The settler made that decision. Is it in the document that we have been given as an exhibit for oral argument? Yes, it is in paragraph B-1. So somewhere in all that it says what that indicates, that this $41,000 can be separated from the $50,000. In B-1, when it's referring to the annuity contract, shall pay the pension benefits for certain participants who satisfy the following conditions. And then there are at least five conditions, one of which is that it identifies the plans in which the people were participants. But one of the conditions is that the employee have started in an annuity prior to January 1, 2010. So these, I see five enumerated sections. Those characteristics just define who is in either the transferee or the non-transferee class. Right. There's a further provision saying that de minimis changes because of data problems or whatever can be made to change the population. But the population group is defined by the settler and therefore is not a matter of discretionary decision on the part of the fiduciary. If I may turn to Count 1. Count 1, the plaintiff's claim that under RISC Section 102B, Verizon could not amend the plan to authorize this annuity transaction unless Verizon had disclosed to participants in a summary plan description several years earlier that it might adopt such an amendment. Under the plaintiff's reading of Section 102B, the fundamental right to amend a plan would be severely limited if you had to predict years in advance the particular amendment that you might adopt. And so it's inconsistent with that fundamental aspect of ERISA. The plaintiff's argument is also inconsistent with the words of Section 102B, which calls for a summary plan description. And a summary plan description is what it says. It's a summary description of the plan. It is not a prediction of future plan amendments. And so Judge Fitzwater was entirely correct to conclude that the 102B claim fails because the statute requires only a description of existing plan terms, not a disclosure of future plan changes. And that reading by Judge Fitzwater is consistent with what this court said in Wise v. El Paso Natural Gas. Quote, Section 102B relates to an individual employee's eligibility under then existing current terms of the plan and not to the possibility that those terms might later be changed, as ERISA undeniably permits. And plaintiffs have pointed out Wise involved a welfare plan, not a pension plan, but by its terms Section 102B applies equally to both pension and welfare plans. Looking at just the more general issue of whether this type of transaction is authorized, I mean, the regulation, plaintiffs do seem to have the plain language of the regulation. It talks about two scenarios, one, going to an annuity when the individual employee stops working, and two, when the plan is terminated. And neither of those happened here, but I know you argue that regulation still supports this. So flesh that out for me. Right. ERISA doesn't have a list of five ways to provide pensions. It has a set of requirements that you have to meet. The use of insurance companies to pay pension benefits through annuities has been going on for 50, 60 years before ERISA, after ERISA, in a variety of circumstances, when the employee reaches retirement age, when the plan is terminated, but also in some cases like this. There's a change, an amendment to the plan to provide it to be done in this way. So you don't think it's unprecedented? And the fact that— Is it unprecedented, like they characterize it? I think they characterize this transaction as unprecedented. I wouldn't know. I mean, many individuals receive their pension benefits through annuities guaranteed by insurance companies, and the fact that the Department of Labor has looked at that and issued regulations about the nature of the insurance contract and the provisions that need to be in the insurance contract shows that it's a permitted secret process. If the Department of Labor wanted to issue regulations saying that it can't be used in these circumstances, it would have. But is there anything in the evidence to show that it is unprecedented or otherwise to take the overall class of all retirees and divide them in two and provide annuities for one group and leave the rest in the plan? Is there any indication that's been done before? You know, there's been some big transactions of this nature in recent years. General Motors was one, whether that included all employees or not all employees, I don't know. There's a very sound reason why this was done for a group of employees. To calculate the pension liabilities is complicated, and it's very complicated where you have current employees who are still working, who may or may not be terminated, who may or may not get salary increases. And so in order to negotiate with an insurance company and determine the parameters and the cost of the insurance company taking over, you need to have a fixed set, fixed population, and it's very helpful if they're all already taking their benefits. But this divided up even pure retirees who are no longer working, right? They pulled out the managerial employees, but non-managerial retirees were kept in. Right, and they're subject to collective bargaining agreements or additional complications for doing that. So they picked out—they have a plan that has $24 billion in assets, 100,000 employees, and it's hard to be nimble in investing that money with that big a plan. So they took a set of 41,000 and shifted the responsibilities to one of the largest and most successful insurance companies in the world and negotiated a contract which had a special provision, which is a guaranteed separate account, which meant that the $7 billion that are dedicated to the pension benefits of these employees are not subject to other creditors in the event of a bankruptcy. So these employees have special protection, and in addition, if it turns out the amount of money in that separate account is not enough, then Prudential is on the hook to do the funding. But in order to negotiate that contract, it's helpful to have people already in stat pay status for a couple of years so that if there's any dispute about what their entitlement is, that dispute would have been raised and resolved. Going back to the disclosure requirement, one of the reasons Judge Fitzwater dismissed count one was because the statute only requires disclosure in the SPD of existing plan terms. But the other reason was there's simply no loss of benefits here. Every member of the class continues to receive the same benefit in the same amount in the same form as before. Therefore, it simply does not fit within the statute. In breach of fiduciary duty claim, the important concept, as counsel has already mentioned, is the distinction between the settler function and the fiduciary function, and the two-hat doctrine that the employer or others sometimes operates in a settler capacity, not subject to fiduciary duties, sometimes in a fiduciary capacity and is subject. And here, the document that counsel brought to the attention of the court shows that many aspects of this transaction were determined by the amendment itself, and therefore our settler function. And that includes the requirements both in section one, the contract shall be guaranteed, and in section three, a certificate shall be issued and the terms that the contract shall provide that benefits are legally enforceable by sole choice of the individual. Those three provisions are significant because those are the requirements under the annuitization regulation that results in the individual no longer being a planned participant. On the functions that I think you acknowledge are on the fiduciary side, which include going out and selecting who's going to provide the annuity. Plaintiffs allege there wasn't due diligence. It didn't make sense to put all the eggs in the prudential basket. And the district court basically says, well, there was this issue about the dates, and he says, no, if you look at the whole complaint, it was really a few months. But isn't it a fairly aggressive ruling at the pleading stage to basically say as a matter of law that those few months was a reasonable amount of diligence in selecting prudential as the sole provider? Well, first of all, let me make one point, which is the plaintiffs in both their brief and their reply brief, their brief at 24 and their reply brief at 7, say the district judge treated everything as a settler function. That's simply not true. He did identify aspects of the claim that were fiduciary, which we acknowledge, and dealt with them. He gave them ‑‑ they amended the complaint twice. He had written two opinions explaining why he thought the claims were legally deficient and what additional allegations were required. And they amended ‑‑ after the second amendment didn't cure any of those defects. The selection of prudential, you know, it can't be irresponsible to pick prudential. One of the arguments the plaintiffs made was ‑‑ Well, one was to spread risk. Don't just pick one company that might ‑‑ you know, we all saw what happened in 2008. I understand the way this is structured. There's some safeties built in. But, I mean, certainly one argument is that if prudential collapses, that's because the whole economy has collapsed and the next insurance company is going to collapse as well. But it's also an added expense to negotiate with two and a complexity to have two separate contracts. And so the fiduciary can make a reasonable decision that that is a proper decision. And it's simply not true that that decision was made hastily as the plaintiff's assumption. But how do we know at the pleading stage? I mean, that's my concern. You may be 100% right about all this, but they have no idea. And it's the type of issue on which, without discovery, they have no idea what kind of diligence was conducted, what kind of relationship might have existed with prudential, what other companies were looked at and what their terms were. I mean, there's no way for them to know without some discovery. Well, here I think there is. Here, and Judge Fitzwater was pretty careful in going through and responding on precisely that issue, one is that the allegations of the complaint make clear that the contract with the fiduciary was signed two months before the amendment was adopted. And the complaint attaches a whole bunch of documents to it, the initial complaint, including the engagement letter with the independent fiduciary, and the fact that an independent fiduciary was selected to go through these very questions that you've identified. To what extent did Judge Fitzwater, I know on deciding to choose only one as opposed to multiple companies, Judge Fitzwater read that the allegations were conclusory, that the plaintiffs in the complaint had not really addressed what the difficulties were. Did he make that same ruling as to the point Judge Costa is raising, that not sufficient due diligence in exploring stability of prudential and whatever else may have been in the complaint? I'm not sure how much he ruled just that there were not sufficient allegations in the complaint and how much of it was something else. Well, I think one of the things the judge did was to look at what was alleged and look at the attached documents. We know that Verizon didn't simply select an insurer on its own. It selected an independent fiduciary and assigned to the fiduciary the task of considering what insurance companies are able to provide this and to identify a list of possible insurers and then to decide, among other things, should it go to one, should it go to multiple. And the independent fiduciary then negotiated a 140-page contract that includes special protections such as the guaranteed separate account. So where you have an independent fiduciary negotiating a 140-page document specifying how this transaction goes forward to say, well, they didn't exercise reasonable care, the plaintiff has a burden to go far beyond that and to identify why it was irresponsible to pick prudential and why it was irresponsible when the contract has this extra layer of protection of the guaranteed special account. Would you address the issue of discrimination under ERISA? Right. The plaintiffs argue that the transaction violates Section 510. And one of Judge Fitzwater's comments was that to accept plaintiff's argument means that any plan amendment that disadvantages some group of employees will be a violation, and that just can't be right. The exact contours of Section 510 have courts have struggled to identify what they are, but the clearest case is an example would be a dental practice. The dentist and four staff employees. And under a pension plan, if you don't vest in your benefit until five years of employment, if the dentist terminated each staff member after four years and six months and did so with the purpose of preventing them from vesting so that all the assets would be reserved for his own retirement, that's a violation of 510. But just as clearly, a plan amendment can't be. And courts have struggled to say whether or not all plan amendments are outside the scope of 510 or not. But certainly what we can do is look at the language of 510 and look at the last part of it, and it's only discrimination for the purpose of interfering with the attainment of any right. And cases in this circuit have said that basically that requires two things. It requires an allegation of a specific intent, and I would say that's a specific malicious intent, some wrongful intent, and secondly, interference with a right. The plaintiffs say, well, the right is the right to continue in a plan. And the judge quite correctly concluded there is no such right because look at the department regulations which provide, among other things, that where you get a pension contract or an annuity contract such as this guaranteed by an insurance company, you are no longer a plan participant. So there is no right to continue. There's a right to get the same amount of benefit, and that's protected by Section 204G of ERISA, but no one claims here that any individual has lost any payment, so that the plaintiff's argument under Section 510 simply goes way too far. All right, Counsel. Thank you. Thank you. May it please the Court. Just to address a few of the issues that you brought up, there's a factual issue about whether the collected bargained retirees are indeed subject to a bargaining agreement. We don't make that allegation in the complaint, and you cannot tell from the complaint, and I just know that that's an issue that will be further explored, but there hasn't been any discovery in this case because there was a complete stop, a protective order was entered. And as far as the circumstances that are listing, the company knows better than to just say we have the right to make a change, and we can't predict what changes we're going to make. They listed in this SPD about 10 or 12 circumstances that could occur in which a person would lose the ability to participate in the plan. And this was not one of them, just being lifted out at the whim of the company and put into an insurance annuity. These folks were given a choice at the time of their retirement, whether they wanted a lump sum distribution or to be in a ERISA-protected plan, and they chose to be in an ERISA-protected plan for good reason. And the protection that's provided by the PBGC, that's a viable right. It has value. It costs over $48 a year for every company to provide that protection to the retirees. That's something that they've lost, and they've lost the right to ready access to federal courts. They can no longer come in here and complain, and the important thing is the right to annual disclosures. And when opposing counsel talks about the 140-page contract, which I've looked at, there's nothing in that contract that says that Prudential ever has to make any disclosures ever in the future about anything to the people. And that's something they want to know, who's managing their money, how much is left, and why couldn't that have been put in there. Under the circumstances, it wasn't such an exigency that they had to rush through it. They could have thought, what's in the best interest of the people? If we consult with them, we would find that they really want the annual notice disclosures, and they want to know how it's managed and how it's invested. That wasn't done. And that issue was never even brought up. It was brought up in our complaint, but it was never brought up by the district court. The district court looked at only one fiduciary function, and that was selecting an insurance annuity. But the court didn't look at the fiduciary function when it came to actually determining the terms of the contract and acting in the best interest of the people. And that's when we say, that's where they let us down. Why didn't they include the annual disclosure requirements that they were used to? And I want to go back to the Section 510 claim about what a settler does and what a settler doesn't do. This court has twice reserved the issue, in McGann and in Hines, about whether or not an amendment could, in itself, be a discrimination under Section 510. And we think this case brings it front and center, and it's an opportunity for the court to address that issue. The district court noted and didn't address the issue because there hasn't been a decision by the Fifth Circuit. And I think that's an important issue for us to resolve before it's reversed and remanded to the district court. And, of course, it's still under Rule 12b-6 motion. We didn't have the opportunity to do any formal discovery, and there are a lot of fact questions that remain to be resolved, including why weren't the collective bargaining people included if you're going to take out all the retirees? And why really was this a date of January 10 as opposed to some other date? Or why wouldn't everybody be treated alike, all retirees? And then the whole other issue that has never been addressed to this point is, why did the company use all this money to pay what are called settler expenses? It doesn't matter whether they were reasonable expenses, and we never got there because we didn't see the expenses, but the question is, they were really settler expenses. It should have been in accordance with the plan terms, Section 8.5, not charged to the pension plan. But in their hurry to get this done, they took out a billion dollars and paid all the bills. And we say, well, that included all these third-party expenses and things that would have nothing to do with ongoing administration of the plan. And for all the reasons that we've presented and all the reasons that we've stated in the appellate briefs, we ask this Court, respectively, to reverse the judgment and remand with instructions and award costs and fees as we've worked hard for this. Thank you very much. All right, counsel. Thanks, both sides, for bringing the always fascinating ERISA regime to our attention. We will take about a 10-minute recess.